**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-CR-12 (CRC)** |
| **v.** | : | |
| | : | |
| **ANDREW GALLOWAY,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Andrew Galloway to 30 days' incarceration, 36 months' probation, and $500 restitution.

### I.    Introduction

The defendant, Andrew Galloway, a former serviceman in the United States Navy, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.7 million in losses.[1]

On March 8, 2022, Galloway pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 30 days' imprisonment and 36 months' probation is appropriate in this case

---

[1]    As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

because Galloway: (1) breached the U.S. Capitol through a broken window near the Senate Wing Doors within approximately 11 minutes of the initial breach, which occurred when other rioters smashed a window in that same location, doing so even after he saw police officers using pepper spray and droplets of blood; (2) made clearly false, self-exonerating statements to FBI agents about his participation in the riot; (3) loudly and publicly expressed his support for the riot shortly after leaving the Capitol building; (4) as a former serviceman in the United States Navy for four years, knew that the assault on the Capitol Building on January 6 where a mob of angry rioters vastly outnumbered the police officers valiantly attempting to defend the building and its occupants would likely cause serious injuries to those officers; (5) has followed social media posts of the Proud Boys even after the January 6 riot, and (6) has not offered a sincere expression of remorse for his conduct on January 6.

The Court must also consider that Galloway's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.  *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic process of this country.  I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates).  Galloway's actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators, and their staffs, and disrupted the certification vote for several hours.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing

2

those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).
Here, the fact and circumstances of Galloway's crime support a sentence of 30 days' incarceration,
36 months' probation, and $500 restitution.

## II.    Factual and Procedural Background

### a.    The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the
U.S. Capitol.  *See* ECF 21 ("Statement of Offense"), at 1-7. As this Court knows, a riot cannot
occur without rioters, and each rioter's actions – from the most mundane to the most violent –
contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop
we turn to the defendant's conduct and behavior on January 6.

### b.    Galloway's Role in the January 6, 2021 Attack on the Capitol

Galloway traveled from Wyoming, where he lived at the time, to Washington D.C., in order
to protest Congress's certification of the electoral college vote on January 6, 2021.  Statement of
Offense at ¶ 8.  Galloway attended the "Stop the Steal" rally on the morning of January 6, 2021,
and then marched to the U.S. Capitol.  According to a voluntary interview with the FBI, Galloway
approached the Capitol Building from the inaugural stage on the Capitol's West Side, where he
observed U.S. Capitol Police using pepper spray.

At approximately 2:13 pm, rioters smashed a window next to the Senate Wing Door using
a riot shield.  This led to the first breach of the U.S. Capitol by a rioter who jumped through the
window over the broken glass:



Approximately 11 minutes after the entry depicted above, Galloway entered the U.S. Capitol through another smashed window on the opposite side of the Senate Wing Door, as shown below (Galloway is circled in red).



When breaching the Capitol through the broken window, Galloway pumped his fists and, based on the CCTV video (which does not have audio), appears to have shouted in exclamation, as shown below:



*See also*, Ex. A, CCTV Video Montage (00:00 – 00:40) (Galloway at times identified by red circle). [2]   As can be seen in the lower right corner of the photo above, broken glass was on the floor of the Capitol as Galloway entered.

Galloway then proceeded to the Crypt, where he joined a large mob that confronted a line of Capitol Police officers attempting to keep the rioters from crossing to the other side.  Galloway smoked an unknown substance while in the Crypt surrounded by the mob:

---

[2] Exhibits A and B have been submitted directly to the Court and defense counsel via USAfx.



*See also*, Ex. A, CCTV Video Montage (00:00:50 – 00:01:50) (Galloway at times identified by red circle).

Galloway crossed and exited the Crypt and then returned the way he had entered shortly afterwards.  He exited the Capitol at approximately 2:34 pm through another window in the Senate Wing Door area.  *Id.*  (00:02:10 – 00:03:25).  In total, Galloway spent approximately ten minutes inside of the Capitol.   Galloway has admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so, and that he willfully and knowingly paraded, demonstrated, or picketed while in the Capitol.  Statement of Offense at ¶ 21.

   *c.   Galloway's "That Was Us" Public Rant After the Riot*

After participating in the riot at the U.S. Capitol, Galloway stayed in a hotel in Washington D.C.   Nearby the hotel, he was captured on a publicly available video standing in the street and yelling, among other things, "These are our streets"; "Yeah that was us today, no that wasn't

Antifa"; "Fuck this government, this is our country." *See* Ex. B, "Police Encircle Trump Supporters at Their Hotels" (beginning at 00:00:24).[3]

>        d.   *Galloway's FBI Interview*

On February 1, 2021, the FBI conducted a voluntary interview of Galloway at his residence in Wyoming.  Galloway admitted to traveling to Washington D.C. on January 6 and being near the Capitol.  He further admitted that he entered the Capitol from the West side, saw officers using pepper spray, and saw droplets of blood.   Galloway falsely denied, however, that he entered the Capitol building.  He also showed the interviewing agents photos from his phone to purportedly corroborate that he did not enter the Capitol.

During the interview, Galloway did not show any remorse for his participation in the riot on January 6.  Rather, he insisted that the actions of him and others were beautiful, and that law enforcement was taking the actions of that day out of context.  Galloway also falsely claimed that any agitators at the Capitol on January 6 were members of the group Antifa.  His allegation was not only unsupported by any corroborating evidence, but it was also belied by Galloway's own boast, as recorded on the night of January 6, that "Yeah that was us today, no that wasn't Antifa."

Although Galloway has now accepted responsibility for illegally entering the Capitol, to date, Galloway has not offered a sincere expression of remorse for his conduct on January 6.

Relatedly, records of Galloway's social media history recovered by FBI agents from Galloway's mobile telephone phone when it was seized during his arrest in January 2022 revealed that, even after the January 6 riot, Galloway actively followed communications from the Proud Boys—a nationalist organization with a well-documented history of participating in violent acts, whose leadership has been charged with seditious conspiracy for its role in the January 6 attack on

---

[3] Exhibits A and B have been submitted directly to the Court and defense counsel via USAfx.

the Capitol.  *See* Ex. C (Proud Boys chat dated December 4, 2021); Ex. D (undated Proud Boys chat referring to the "political prisoners of January 6th"); *see also* Superseding Indictment, *United States v. Nordean* (21 Cr. 175) (June 6, 2022).

> *e.   The Charges and Plea Agreement*

On January 4, 2022, Galloway was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 11, 2022, Galloway was arrested, and on January 13, 2022, he was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On March 8, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building.  By plea agreement, Galloway agreed to pay $500 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

Galloway now faces sentencing on a single count of violating 40 U.S.C.  § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Galloway faces up to six months of imprisonment and a fine of up to $5,000. Galloway must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with police officers and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while looking at Galloway's individual conduct, this Court should look to a number of critical aggravating and mitigating factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated

with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Galloway personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Galloway's part is therefore not a mitigating factor, nor does it meaningfully distinguish Galloway from most other misdemeanor defendants. Galloway's lack of violence and property destruction is the only reason he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

Galloway approached the Capitol from the West side and breached the Senate Wing Door area within approximately 11 minutes of the initial breach. He admitted to the FBI that he observed Capitol Police attempting to use tear gas and that he saw droplets of blood but—contrary to his false denial to the FBI—he nevertheless chose to continue into the Capitol. Galloway jumped into the Capitol Building through a broken window and landed in a hallway with broken glass on the floor. He pumped his fists and seemingly screamed exuberantly when jumping into the building while he knew, as he has now admitted, that he was not authorized to enter the Capitol. In doing so, he gave encouragement to other rioters who saw his conduct and followed behind him.

Galloway proceeded into the Crypt and joined a large mob of rioters that faced off with, and eventually overran, a group of Capitol Police officers. It is well-established that the primary reason the rioters were able, time and again, to overrun police lines on January 6 is that the rioters greatly outnumbered the officers. Galloway contributed to that imbalance, and thereby strengthened the mob, in the Crypt.

As a Navy veteran, Galloway was well aware of the great jeopardy posed by violent entry into the Capitol by the rioters.  He was also aware of the violence required to make that entry into the Capitol.  Nevertheless, Galloway exulted upon entering the Capitol through the broken window.  Further, he continued that night to boast publicly about his illegal exploits on January 6, exclaiming, "Yeah that was us today, no that wasn't Antifa."  Galloway's conduct thus showed a manifest indifference to the very real harm that the rioters, whom he joined eagerly, caused to police at the Capitol.

Furthermore, Galloway's statements after January 6 show a total lack of remorse. When interviewed by the FBI, Galloway claimed that the actions of the rioters were beautiful; that any law enforcement concern about January 6 was essentially misguided; and that any bad conduct on January 6 was committed by Antifa.  The latter statement is particularly pernicious: while it is of course repugnant to baselessly accuse individuals or groups of misconduct in the public sphere, it is another thing entirely to level false accusations to the FBI.  Moreover, Galloway's accusation to the FBI regarding Antifa was grossly cynical given his own public pronouncement—of which, of course, the FBI was already aware—that it was "us" not Antifa that was responsible for the Capitol riot.

Not only did Galloway make false accusations about the Capitol Riot and show no remorse for it, but he lied to the FBI about having entered the Capitol.  This was not a casual slip; Galloway went so far as to show the interviewing agents photos from his phone in an attempt to mislead them about where he had and had not been in the Capitol.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B.  Galloway's History and Characteristics**

As set forth in the Presentence Investigation Report, Galloway's criminal history consists of juvenile adjudications and other offenses, including petty theft and driving under the influence of alcohol, that are more than ten years old.  ECF 25 ¶¶ 28-35 ("Galloway PSR").  Galloway enlisted in the U.S. Air Navy in 2008 and was honorably discharged in 2012 after serving domestically and overseas, including in Afghanistan.  *Id.* at ¶¶ 41, 62.  Since leaving the Navy, Galloway worked for Kellogs for a few years, started a t-shirt business, and worked as a driver. *Id.* at ¶¶ 60-64. Veteran disability benefits currently are his primary source of income.  *Id.* at ¶ 64. Galloway has been compliant with his conditions of pre-trial release.

While Galloway's military service would otherwise be laudable, it renders his conduct on January 6 all the more troubling.  From his former military service and training, Galloway should have known the danger that the violent mob posed to police officers protecting the Capitol and Congresspersons and staff working inside the Capitol.  Further, as a former serviceman, Galloway, upon choosing to speak voluntarily with the FBI, can be expected to have understood the FBI's important mission and to have been honest in that interview.  Galloway, however, chose to ignore all the signs of danger posed by the mob when storming into the Capitol on January 6, and he chose to lie to the FBI about his role in the riot weeks later.

Moreover, Galloway has not shown any remorse for his conduct.  Following the Proud Boys on social media after January 6 is, of course, permissible First Amendment activity, and it does not amount to planning to storm a government building, attack police, or commit other crimes with the Proud Boys before January 6 (or after, for that matter).  Galloway's choice to follow on social media the Proud Boys and other apologists for those who committed crimes in attacking the Capitol, however, does bear on his lack of remorse.  *See* Ex. E (Telegram chats referencing

12

"mistreatment of Jan 6th prisoners" and alleging "the real insurrectionists … are the Democrats …").

In sum, Galloway's former military service makes his conduct on January 6 more egregious, and his lack of remorse further demonstrates a very real need for specific deterrence in the form of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[4]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), *available at*: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

*a. General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.") (statement of Judge Walton).

       *b.*      *Specific Deterrence*

Galloway's conduct on January 6 and during his post-arrest interview clearly demonstrate the need for specific deterrence for this defendant. Galloway entered the Capitol from the West Side, where the rioters committed some of the most vicious attacks and where the smell of tear gas, the sound of flash bangs, and the scenes of violent confrontation made it plain for all to see that a dangerous riot was underway. Galloway himself admitted he saw police officers using pepper spray and saw droplets of blood. Galloway nevertheless stormed into the Capitol through the Senate Wing Door within approximately 11 minutes of the initial breach, jumping through a broken window.

Galloway then celebrated the violence of the riot on the evening of January 6 by giving a public rant in the streets of Washington D.C., in which he said, among other things, "Yeah that was us today, no that wasn't Antifa"; "Fuck this government, this is our country." Ex. B. Weeks later, when interviewed by the FBI, Galloway lied about the fact that he had entered the Capitol; tried to deceive the interviewing agents by showing photos purporting to corroborate his lie; and falsely accused Antifa of being responsible for any misconduct on January 6.

As of the date of this filing, Galloway has not expressed remorse. Instead, at least as of January 2022, he has chosen to take shelter by following the public communications of those who treat the perpetrators of the attack on the Capitol as victims, and of those who continue to champion their role in that attack. The Government acknowledges that Galloway accepted responsibility by timely entering into this plea agreement following his arrest. On the other hand, Galloway's failure to acknowledge the dangers and violence of January 6, 2021, and his lack of remorse for his role in the riot, underscore the need for specific deterrence here.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to felony assaults on police officers and conspiracies to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[6] *See United States v. Anna Morgan-Lloyd*,

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities. Ex. F.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted

1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous and are thus treated more severely in terms of their conduct and subsequent punishment. Those who trespassed but engaged in aggravating factors merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Galloway has pleaded guilty to Count Four of the Information, charging him with parading, picketing or demonstrating on Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

---

sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.   *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentences imposed on Boyd Camper and Tan Dim Pham for reference.  In *United States v. Camper* (21 Cr. 325)*,* the defendant, a former

marine, pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  Camper entered the U.S. Capitol despite seeing violence between rioters and officers; he concealed video and audio evidence collected by the Go-Pro camera that he brought inside the Capitol; and he made statements to the media indicating a complete lack of remorse and suggesting the possibility of future violence.  In *Camper*, the Government sought, and the Court imposed, 60 days jail time.

In *United States v. Pham* (21 Cr. 109)*, the defendant, an active duty police officer, saw people trying to incite the police during the riot; walked past knocked-down fences and other barricades to make his way inside the U.S. Capitol; entered the Capitol cheering "We're taking the house back!";  spent approximately 20 minutes roaming throughout the building and penetrated to an area of offices; falsely downplayed his conduct to FBI agents; and engaged in the aforementioned conduct even though, as an experienced police officer, he in particular should have known the danger of it.  In *Pham*, the Government sought 60 days incarceration and the Court imposed 45 days.

In this case, as in *Camper* and *Pham,* the defendant saw many red flags that he was entering the Capitol during a dangerous riot; entered the Capitol (through a broken window) while acting triumphantly, thereby encouraging other rioters; engaged in this conduct even though as a former serviceman he should have known the danger to police officers posed by his participation in the riot; he subsequently made false statements to the FBI; and he has failed to show remorse.   Thus, a sentence of 30 days imprisonment here would be consistent with similar (albeit non-identical) cases and would not create an unwarranted disparity.

**F. This Court's Authority to Impose a Sentence Requiring a Term of Imprisonment and a Term of Probation**

As eight judges of this District have now concluded, this Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; *see, e.g.*, *United States v. Little*, 21cr315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022)

20

(same).[7] This Court should follow suit and sentence Galloway to 30 days' imprisonment and 36 months' probation.

### G. This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation pursuant to 18 U.S.C. § 3563(b)(10)

The government recognizes that this Court has previously declined to decide the question of its legal authority to impose a split sentence. *See United States v. Sunstrum,* 21cr652 (CRC), ECF 53 (D.D.C. Apr. 11, 2022). If the Court, in its discretion, prefers not to decide the issue here, it could order, pursuant to the plain language of 18 U.S.C. § 3563(b)(10), that Galloway be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10). Under this authority, the Court could sentence Galloway to 14 days' imprisonment as part of a sentence of 36 months' probation.

Congress enacted 18 U.S.C. § 3563(b)(10) to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s

---

[7] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation" and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).   A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21-cr-620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21-cr-370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43  (same); *United States v. Cameron*, 22-cr-00017 (TFH) ECF 36 (D.D.C. Aug. 17, 2022) (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent"

confinement.  For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

### H.  Conclusion

For the reasons set forth herein, the government recommends that this Court sentence Andrew Galloway to 30 days incarceration, 36 months' probation, and $500 in restitution. Such a sentence would protect the community, promote respect for the law, and deter future crime by imposing restrictions on the defendant's liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATHEW GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:      *Jason Manning*
        _____

JASON M. MANNING
Trial Attorney, Detailee
NY Bar No.: 4578068
1400 New York Avenue NW
Washington, D.C. 20005
Jason.Manning@usdoj.gov
(202) 514-6256