```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2
        - - - - - - - - - - - - - - - x
3       THE UNITED STATES OF AMERICA,
                                          Criminal Action No.
4                    Plaintiff,          1:22-cr-00012-CRC-1
                                          Wednesday, October 12, 2022
5       vs.                              11:05 a.m.

6       ANDREW GALLOWAY,

7                    Defendant.
        - - - - - - - - - - - - - - - x
8

9       _____

10                  TRANSCRIPT OF SENTENCING HEARING
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                   UNITED STATES DISTRICT JUDGE
        _____

12

13      APPEARANCES:

14      For the United States:        JASON MANNING, ESQ.
                                      DOJ-CRM
15                                    1400 New York Avenue NW
                                      Washington, DC 20005
16                                    (202) 514-6256
                                      jason.manning@usdoj.gov
17

18      For the Defendant:           ALLEN HOWARD ORENBERG, ESQ.
                                      THE ORENBERG LAW FIRM, P.C.
19                                    12505 Park Potomac Avenue
                                      6th Floor
20                                    Potomac, MD 20854
                                      (301) 984-8005
21                                    aorenberg@orenberglaw.com

22      Court Reporter:              Lisa A. Moreira, RDR, CRR
                                      Official Court Reporter
23                                    U.S. Courthouse, Room 6718
                                      333 Constitution Avenue, NW
24                                    Washington, DC  20001
                                      (202) 354-3187

25
```

```
 1                      P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  We are on the record in
 3      Criminal Case 22-012, United States of America vs. Andrew
 4      Galloway.
 5              Starting with the government, would you please
 6      introduce yourselves for the record.
 7              MR. MANNING:  Good morning, Your Honor; Jason
 8      Manning for the government.
 9              THE COURT:  Good morning, Mr. Manning.  How are
10      you?
11              MR. ORENBERG:  Good morning, Your Honor; Allen
12      Orenberg on behalf of Mr. Galloway, who is appearing
13      virtually today with his consent.
14              THE COURT:  Okay.  Good morning, Mr. Orenberg.
15              Good morning, Mr. Galloway.  I can see you.  Can
16      you see and hear me okay?
17              THE DEFENDANT:  Yes, Your Honor.
18              THE COURT:  Okay.  We are here for the defendant's
19      sentencing.  The Court has reviewed the presentence
20      investigation report and recommendation, the sentencing
21      memos that have been submitted by both sides as well as two
22      videos provided to the Court by the government; one showing
23      Mr. Galloway in the Capitol building, and the other a
24      YouTube video taken later in the day.  I've also read
25      letters submitted by a number of Mr. Galloway's family
```

1    members, including his mother, his younger sister, his older

2    brother, and an older cousin.

3            Anything else for the Court's review in writing

4    today?

5            MR. MANNING:  Nothing from the government, Your

6    Honor.

7            MR. ORENBERG:  Nothing further, Your Honor.

8            THE COURT:  Okay.  Starting with the factual

9    findings in the presentence investigation report, I did not

10   notice any unresolved objections.

11           Mr. Orenberg, any objections to the factual

12   findings in the presentence investigation report?

13           MR. ORENBERG:  No, Your Honor.

14           THE COURT:  And Mr. Manning?

15           MR. MANNING:  No, Your Honor.

16           THE COURT:  Mr. Galloway, did Mr. Orenberg review

17   the presentence investigation report with you, and have you

18   been satisfied with his services in the case thus far?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  Okay.  Hearing no objections, the

21   Court will accept the factual findings in the PSR regarding

22   the circumstances of the offense; and, therefore, those

23   facts, as stated in the PSR, will be adopted for purposes of

24   sentencing.

25           Just for the record, Mr. Galloway pled guilty to

1    one count of parading, demonstrating, or picketing in a

2    Capitol building.  The statute authorizes me to impose a

3    term of imprisonment of up to six months, probation of up to

4    five years, and to impose a fine up to a maximum of $5,000.

5    The statute does not authorize a term of supervised release

6    following any incarceration.

7         Pursuant to the defendant's plea agreement, he has

8    agreed to pay restitution in the amount of $500 to the

9    Architect of the Capitol to help compensate for the damage

10   done to the Capitol.

11        The offense is a Class B misdemeanor, so the

12   federal sentencing guidelines do not apply.

13        Any objections, Counsel?  Did I get that right,

14   Mr. Manning?

15        MR. MANNING:  It seemed correct to me, Your Honor.

16   Thank you.

17        THE COURT:  Okay.  Mr. Orenberg?

18        MR. ORENBERG:  That's correct, Your Honor.

19        THE COURT:  All right.  The government has

20   recommended a sentence of 30 days imprisonment, three years

21   probation, and $500 in restitution.

22        The probation office has submitted a

23   recommendation concurring with the government with respect

24   to 30 days incarceration.  It also recommends a $1,000 fine,

25   the $500 in restitution, but no period of probation.

 1            All right.  With that, would the government like
 2    to address the 3553(a) factors?
 3            MR. MANNING:  Yes, Your Honor.
 4            If I may, I'd like to start by discussing one sort
 5    of procedural issue.
 6            THE COURT:  Sure.
 7            MR. MANNING:  And then I'll address the 3553(a)
 8    factors and the government's recommendation here.
 9            The procedural issue is this.  You know, the
10    government and the defense filed their submissions here
11    simultaneously.  In the government's submission, we took
12    issue with what we alleged to be Mr. Galloway's false
13    statements and lies to the FBI, and then when we read
14    Mr. Orenberg's submission later that evening, it appeared
15    to us that the 302 memorializing that interview in which
16    Mr. Galloway made those false statements in February of
17    2021, it appeared perhaps the government had failed to turn
18    that over to Mr. Orenberg.
19            And so we went back through our files from our
20    predecessor who had had this case originally, couldn't find
21    an indication that it had been turned over, so we sent it
22    over to Mr. Orenberg right away.
23            We own that mistake, and we offer him a chance to
24    put in an either supplemental submission or address it on
25    the record because he couldn't address it before his

1    submission.  And we'd just note that and regret the mistake.

2              THE COURT:  I was obviously going to ask you about

3    that and give Mr. Orenberg an opportunity to address it when

4    he addresses the Court.

5              Do you want to comment on the process now and

6    then reserve any substantive comments for your presentation,

7    Mr. Orenberg?

8              MR. ORENBERG:  Yes, Your Honor.  If I may?

9              That is correct.  Mr. Manning did contact me a day

10   following the submissions, indicated that the government had

11   neglected to file or send me the 302, which they promptly

12   did.

13             I discussed it with my client.  He was provided

14   a copy of that 302 right away.  What we decided -- what

15   Mr. Galloway and I decided was to address it today in our

16   remarks to the Court.

17             THE COURT:  So you don't need a continuance of

18   this hearing in order to address it in writing or to --

19             MR. ORENBERG:  No, Your Honor.  Mr. Galloway wants

20   to go forward today.

21             We did discuss it thoroughly late last week, and

22   he does want to go forward today and get the sentencing

23   behind him.

24             THE COURT:  Okay.

25             All right.  Mr. Manning, please proceed.

1          MR. MANNING:  Thank you.

2          So with respect to the 3553(a) factors, we'll

3     start with the nature and circumstances of the offense.  The

4     Court has reviewed the submission.  We don't intend to show

5     any of the video today or go on at length.  The Court is

6     well familiar with the damage done on January 6th.

7          The primary point we'd like to make today, Your

8     Honor, is that there has been extensive evidence put before

9     this Court and other Courts in many proceedings that have

10    all established the basic point that the primary reason that

11    the mob was able to cause so much damage and cause so much

12    harm to the law enforcement that were there that day, to our

13    democracy, and to the Capitol building, the primary reason

14    is simply the size of the mob.  Time and again at every turn

15    law enforcement was simply outnumbered.

16          And so we agree with the defense submission that

17    Mr. Galloway did not take place in any violence.  He did not

18    steal property.  He did not smash windows.  He did not carry

19    weapons.  That's why we're here today on merely a Class B

20    misdemeanor.

21          But nevertheless, he was a part of the size of

22    that mob, and it was the size of that mob that allowed

23    officers to get Maced, to get hit with flagpoles, to get

24    assaulted, and for the mob to get as close to interfering

25    with our democracy as they did, and so his participation in

1    that mob is a serious crime.  That's why we're here today.

2          And there are some aggravating factors here as

3    well in that, you know, first and foremost, you know,

4    Mr. Galloway did not, you know, storm in through an open

5    door an hour after the initial breach.  He came in through

6    an open window, jumped into the Senate Wing door when there

7    was smattered glass on the floor within the first 10 or 11

8    minutes of the breach of the building.  So it was -- and he

9    came up through the west side from which there would have

10   been, you know, no way that he could have missed the obvious

11   signs that this was a violent and dangerous riot that was

12   underway, and he was entering unlawfully.  And he entered

13   exuberantly and did so in a way that would have given

14   encouragement to others.

15          Beyond that, we think of the nature and

16   circumstances of the offense here.  Mr. Galloway, from his

17   previous service in the Navy, should have been well

18   positioned to understand the danger that this mob posed to

19   the outnumbered law enforcement officers, and yet he chose

20   to join the mob anyhow.

21          As he said to the FBI, he knew that there was tear

22   gas being used.  He saw droplets of blood.  All of these red

23   flags were in front of him, and he proceeded in as well.

24          The government is also concerned by Mr. Galloway's

25   dishonest statements to the FBI when he was approached

1   within a month of January 6th and not only stated that he

2   hadn't gone into the Capitol but, you know, tried to falsely

3   corroborate that false statement by misleading the agents by

4   showing photos on his phone.  And beyond that, his

5   statements to the agents were that the actions of January

6   6th were beautiful, and that if there's any bad acts, it was

7   caused by Antifa, not by the people protesting the election.

8   And all of that goes to a lack of remorse.

9            And so those are the primary --

10           THE COURT:  Mr. Manning, on that point, give me a

11   sense of the times.  He was interviewed by the FBI soon

12   after January 6th, but he was not charged until '22,

13   correct?

14           MR. MANNING:  That's correct, and he did promptly

15   plead guilty upon being charged and deserves credit for

16   accepting responsibility in that fashion.

17           THE COURT:  All right.  And what prompted the FBI

18   to speak with him in '21?  And did the statements that he

19   made about not being involved lead the FBI not to take

20   action then, and then what led to his arrest a year later?

21           MR. MANNING:  Your Honor, I think the most I can

22   say about that is that, you know, he was identified in --

23   you know, by various forms of information as being outside

24   the Capitol, and so he was, you know, approached promptly in

25   the chronology of the investigation.

1        But I can't go so far as to say his denial of

2   being inside the Capitol is what required additional

3   investigation or postpone our ability to charge him.  I

4   wouldn't say it impacted the course of the investigation in

5   that manner.

6        THE COURT:  Let me put it differently.  Was the

7   FBI aware back in January of '21 that he had gone inside of

8   the Capitol, or was its information at that point only that

9   he was outside in a restricted area?

10        MR. MANNING:  Your Honor, I can't answer that with

11   certainty one way or the other.  I'm sorry.

12        The FBI was aware, when they approached him in

13   February '21, of the video that was submitted to this Court

14   as Exhibit B in which he, you know, proclaimed on the

15   streets of D.C. that, you know, quote, that wasn't us, that

16   was Antifa.  And so when Mr. Galloway said to the agents in

17   that interview any bad actions would have been caused by

18   Antifa, the FBI knew, you know, in that moment that that was

19   contradicted by his previous statements.

20        But I can't answer your question about when it was

21   established he was inside the Capitol.

22        So those are the primary points, as further

23   spelled out in our submission, as far as the nature and

24   circumstances of the offense and our view of the offense

25   conduct here.

1    As far as our recommendation, you know, the

2    recommendation we put in was for both the 30 days followed

3    by 36 months probation, known as a split sentence.  We

4    understand, you know, from this Court's comments in a

5    previous January 6th sentencing of Traci Sunstrum that the

6    Court thinks or believes there to be, you know, legal

7    uncertainty surrounding the viability of a split sentence,

8    and so we're not going to try to persuade the Court

9    otherwise today.

10    So we recognize that where we are today is sort of

11    a one or the other, as far as incarceration or probation.

12    THE COURT:  Let me give you the benefit of my

13    current thinking on that issue.  As you say, I've tried to

14    avoid imposing split sentences.  I don't believe that I

15    have -- I have not done so thus far in any of the Class B

16    misdemeanor cases that I've had.

17    You know, I've read the opinions that have come

18    out by my colleagues.  You know, I am convinced that those

19    who have sanctioned split sentences have the better of the

20    argument.  I think the vast weight of the authority at this

21    point goes in that direction, as I think you noted in your

22    memo.

23    That said, you know, I haven't found a case,

24    frankly, that I felt it was required in order to serve all

25    of the purposes of sentencing that, you know -- under

1    3553(a).  And so, you know, I want to ask you, if I were to

2    accept your recommendation on incarceration, why is

3    Mr. Galloway also an appropriate candidate for probation let

4    alone three years of probation?

5         It strikes me that, you know, for the mental

6    health concerns noted in the PSR, he has been able to

7    address those on his own apparently successfully.  He is in

8    a -- you know, some sort of job training program or

9    apprentice program or he seems to be, you know, on the road

10    to some steady employment.

11         This is a low-level misdemeanor offense.  I guess

12    the question is, why do you think he is an appropriate

13    candidate for probation on top of a sentence of

14    incarceration?

15         MR. MANNING:  Yes, Your Honor.  I think probation

16    is warranted here to meet the needs of specific deterrence.

17         The government agrees with the Court that

18    Mr. Galloway does have some positive factors.  His efforts

19    to, you know, find, you know, meaningful and lasting work,

20    the support of his family, and his compliance with

21    supervision to date are all positive factors.

22         That said, we believe probation here is primarily

23    warranted for two things.

24         One, as the defense put forward in this

25    submission, Mr. Galloway has struggled with PTSD and mental

1    health issues, and we don't want to go into those in depth

2    on the record other than to say that those issues appear to

3    have left Mr. Galloway vulnerable to, you know, this sort of

4    call to action from some of these other groups that he

5    follows on social media.  And while he certainly shouldn't

6    be punished for his, you know, First Amendment associations

7    with any group, the government has a real concern that if

8    there's another time when one of these groups, such as the

9    Proud Boys or others we described in our submission, put out

10   a call for their followers to take irresponsible and

11   potentially illegal actions, we're concerned that without

12   any supervision Mr. Galloway could remain vulnerable to

13   heeding that call.  And for that reason, for specific

14   deterrence and protection of the public, we believe a period

15   of probation is warranted.

16          THE COURT:  I saw the Proud Boys texts in the --

17   in your submission.  Those seem to date from 2021 before his

18   arrest and plea in this case.  Is that fair, or are you

19   aware of any more recent, you know, contacts or interactions

20   in social media with groups such as the Proud Boys?

21          MR. MANNING:  The Court's supposition is correct.

22   We seized the following at the time of the arrest so the

23   communications are all after January 6th but before his

24   arrest.  We're not aware of any continued associations, you

25   know, one way or another since that time.

```
 1                  THE COURT:  All right.

 2                  Mr. Orenberg.

 3                  MR. ORENBERG:  Thank you, Your Honor.

 4                  THE COURT:  I'm sorry, before we get to you.

 5                  Ms. Field, probation did not recommend a period of

 6      probation.  Do you want to add anything with regards to that

 7      recommendation in light of what Mr. Manning just told us?

 8                  THE PROBATION OFFICER:  Yes, Your Honor.  I did

 9      just want to note that the reason that we did not recommend

10      probation was, as the government stated, he -- or as Your

11      Honor stated, I apologize, he has previously received

12      treatment for mental health issues in the past, and he's

13      done those voluntarily and on his own.  So for those reasons

14      we felt that probation -- he didn't need the services of

15      probation to assist with those concerns.

16                  THE COURT:  Okay.

17                  Mr. Orenberg.

18                  MR. ORENBERG:  Yes, Your Honor.

19                  Good morning, and I guess in contrast to what is

20      being -- what has been discussed for the last few minutes

21      with regard to probation after a term of incarceration, the

22      Court is well aware that I am asking the Court -- we are

23      asking the Court to impose only a term of probation with

24      community service hours.

25                  I feel that Mr. Galloway is the type of person who
```

1     would not only benefit from a period of probation, but the

2     community service hours is something that he will willingly

3     do.  We've talked about it.  He would like to do, and I

4     think he is well situated to do community service hours.

5            As the Court is aware, he is in a stable

6     environment with his family.  He has taken it upon himself

7     to better himself over the past year and a half since

8     January 6th, a little more than a year and a half.  As the

9     Court is aware, he has educational or vocational

10    aspirations.  He's currently in school.  You can notice that

11    perhaps he's wearing the school uniform today, Your Honor.

12    He was in class today, and he stepped out of class for the

13    purposes of his sentencing hearing.

14            But let me back up to some things that Mr. Manning

15    said.  He said that the primary point of the government's

16    sentencing recommendation is the extensive evidence about

17    the mob and the damage that the mob did to the Capitol and

18    to -- and the personal harm done to police officers, and

19    that the mob was overwhelming and all of that.  Well, I

20    think it's important to remind the Court that, sure, my

21    client was part of a mob, may have been part of this mob,

22    but he was acting alone.  He was not part of any group that

23    either planned, preplanned, or I guess spontaneously planned

24    to go to the Capitol and go inside the Capitol building that

25    day.  He was acting by himself.

1          He committed no violence, which the government

2     acknowledged.  There were no weapons.  And he's not being

3     charged in some sort of conspiracy as being part of a mob.

4     I think that is important to note to the Court.

5          Mr. Manning may note that he exuberantly went

6     through a broken window.  Well, as the Court is well aware,

7     and my experience with other January 6th cases and I dare

8     say with Mr. Manning, that that window -- that area where

9     that window was, there were a large amount of people who

10     were pressing from behind, and Mr. Galloway found himself

11     I'm going to say being steered towards that window and sort

12     of forced through that window because of the large size of

13     the crowd behind him.  There was a door nearby.  But both

14     those openings were being used at the time.

15          He was not the person who broke the window or

16     initially with the first group of people who went through

17     that window.

18          Encouragement to others, as Mr. Manning represents

19     to the Court.  I'm not so sure that's quite the way to frame

20     what was going on at that point in time.  Sure, Mr. Galloway

21     was interested in going inside to the Capitol, but as the

22     video reveals, he just jumped in.  I don't see any positive

23     actions on his part of encouraging others to go inside with

24     him.

25          Mr. Galloway was aware of what Mr. Manning calls

1    the red flags of what was going on all around him, but he

2    made the decision to go in.

3            And by the way, Your Honor, Mr. Galloway is going

4    to address the Court, and I think you're going to find his

5    statement to be very heart-felt and very pragmatic about

6    what happened that day.

7            And Mr. Manning makes much of the fact that he has

8    not shown any remorse since January 6th.  Well, he really

9    hasn't had the opportunity.

10           Sure, he may have had that opportunity on February

11   1, 2021, when the police officers came to his home, as I

12   understand it very early in the day, and more or less roused

13   him and interviewed him that morning, and he perhaps did not

14   fully have his wits about him at that time.

15           He said some things that day that -- he's going to

16   explain to the Court why he said those things that day and

17   the way that those things have been represented to the Court

18   and in the Subject 302 that Mr. Manning referred to, which

19   was given to us late last week.  But he really hasn't had

20   any other opportunity to formally, I guess, express remorse

21   to this Court or to the community.

22           Sure, he could have gone on social media and done

23   something about it.  Sure, he could have given interviews to

24   the local press or other media that may have wanted to get

25   his reaction and observations of what happened that day, but

1    he chose not to, Your Honor.  He chose -- once this happened

2    back in January of 2021, and he realized -- and he's going

3    to tell the Court he realized that he did something wrong,

4    he put his head down.  He realized he had to better himself.

5            As I've already said, he's put himself in school.

6    He has --

7            THE COURT:  Before you go there, he certainly

8    could have turned himself in once he knew that the FBI was

9    interested in him and had at least enough evidence to come

10   to his house in February of 2021, like many others did at

11   that point, right?

12           MR. ORENBERG:  Well, that's a very good point,

13   Your Honor, and I'm sorry, I don't have the 302 up in front

14   of me, and I don't have the benefit of I guess delving into

15   it further about that interview that day and what the law

16   enforcement officers may have, I guess --

17           THE COURT:  I mean, I can see why someone in his

18   shoes would roll the dice and hope that they didn't come

19   back, but that still is inconsistent with him accepting

20   responsibility after having time to reflect on it.

21           MR. ORENBERG:  I'm not going to quibble with the

22   Court's observation.  I'll just say, in my experience with

23   other January 6th cases -- and I've had a number of them --

24   I have not -- I don't think I've had someone voluntarily

25   turn themselves in once having been interviewed.

1          Sure, part of the overall process -- once the FBI

2    identifies certain individuals, they would go and interview

3    them and maybe interview others around them, family members

4    or co-workers and so forth, and then make a decision at a

5    time in the future to go ahead and seek a complaint or an

6    indictment and arrest them.  But I have not had that

7    personal experience with a client, so I will defer to the

8    Court on that observation.

9          But, I mean, this is his opportunity.  I mean, and

10   he's going to tell the Court and the community, if anyone is

11   listening in, the press or whomever, about his remorse for

12   his actions that day.

13         Your Honor, and also I want to just address

14   something else that the Court asked about towards the end of

15   the Court's discussion with Mr. Manning.  Yes, it's my

16   understanding, in discussions with my client, that since the

17   events of January 6th and that day he has had no contacts

18   with the Proud Boys or any other sort of group that may be

19   associated with the activities of that day.

20         As I've said, and as Mr. Manning has acknowledged,

21   he's put his nose to the grindstone, Your Honor.  He's in

22   Nashville, Tennessee.  He's living with his family, and he's

23   working hard.  He's going to school.  And, Your Honor, this

24   is -- as compared to many of the other misdemeanor cases

25   that have come, not only before Your Honor but before the

1    Court, and I know the Court is aware of the sentencing table

2    that the government submits in all cases that is now up to

3    some 29 or 30 pages, you know, Mr. Galloway's conduct for

4    this type of conviction is at or near the bottom of the

5    scale as compared to the other misdemeanants in this

6    overall, you know, prosecution of the events of January 6th.

7              So I'm asking the Court to impose just a period of

8    probation with community service hours.

9              THE COURT:  Thank you.

10             Mr. Galloway, what do you want to tell me?

11             THE DEFENDANT:  Good morning, Your Honor.

12             THE COURT:  Good morning.

13             THE DEFENDANT:  First of all, I just wanted to say

14   to you, Your Honor, to the Court, and anybody listening that

15   I apologize for being a hypocrite.

16             First of all, my actions going into this day were

17   never meant in any way to harm, bring any violence or any

18   mob activity at all.  I came there because I was upset.  I

19   was a concerned citizen that -- at the time I was in the

20   middle of a manic episode, as my VA records will show you,

21   that I was diagnosed during this time period with Bipolar

22   Type 1.  And had I gone through it and thought with a clear

23   mind, I don't know that I could say that I wouldn't have

24   been there that day, but I can tell you for sure that I

25   wouldn't have been at the point that I was at.

1          The rantings and such as the videos that we've

2     talked about, as you can see -- if you've ever met anybody

3     diagnosed with those things and heard them speak or address

4     anybody, it takes nothing.  You could tell me that my hair

5     is orange, and I think it's red, and my voice, my tone,

6     would reach those levels.

7          I was already in the process of seeking help.  I

8     did.

9          And I need to apologize to my wife as well.  She

10     begged me not to do that, not to go that day, period.  And I

11     should have heeded her recommendations and kept my nose

12     where it belonged, in the word of God and trust to him, and

13     not put my -- not put -- invested so much into this when

14     just the prosecutor did say -- and he was right -- at that

15     time I could have chose to turn away from that and not go

16     into the building, and I should have chose that.

17          I could have chose, when the FBI agent came to my

18     house, to not -- no matter what, there's no justification.

19     It was a lie.  And I could have come forward and said yes, I

20     was in that building, and that's what I should have done.

21     You're right.  100 percent.  There is no excuse or any other

22     thing that should be said about that except the fact, same

23     thing, that I was in the middle of getting help for that,

24     for being manic, for being in the middle of a mental

25     breakdown, to be completely plain and just honest with you,

1    Your Honor.

2           When March hit that year in 2020, when I went from

3    driving 1200 miles a week for Kellogg, covering three

4    states, to being locked into my little office bedroom going

5    on Zoom calls trying to figure out how to run my business --

6    I was an area manager -- from the Zoom calls just like this,

7    and not be able to make contact with my managers that were

8    in my protocols and have to create a new process, in that

9    time I had started falling into depression about losing my

10   home.

11          My route got cut, I lost my job, and I knew my

12   home was getting ready to be lost, and it broke me, Your

13   Honor.  I worked my whole life to get to that point, and I

14   failed.  As a man, as a husband, as a father, as a citizen,

15   and, as the prosecutor mentioned, as a veteran of the United

16   States, as somebody who served this country proudly through

17   a tour in Afghanistan and other places.

18          You can look at my record in the military; it's

19   exemplary.  There is no mark on there that says otherwise,

20   Your Honor.  I follow orders, and I take pride in my

21   country.  I take pride in the process of my country, and I

22   failed that process.

23          So to sit here, I'm not asking to do anything

24   different than be held accountable for what I did, Your

25   Honor.  I do deserve that.  I would be a hypocrite if I said

1    otherwise.

2              And I just wanted to tell you that I truly am

3    sorry from the bottom of my heart and having time to reflect

4    on that, as you can see -- and I did want to address one

5    other thing about the Proud Boys and who I follow.

6              If you look at those notes, Your Honor, on the

7    messages, the number one thing I would like you to look and

8    picture is how many of those messages are unopened.

9    Hundreds.  Because I didn't follow those actively.  I never

10   posted any of those things.  I never had any association

11   with those people.  I never even heard of the Proud Boys

12   until I got to D.C. and I saw that they were actually --

13   there was Antifa and other people that were attacking

14   citizens in the national news that I think we all know

15   about, that were beating up people at the protests, and

16   these people were helping people get back to their hotel

17   rooms.  That was what I knew about the Proud Boys, and I

18   followed them.

19             So for that I don't feel as I should be painted

20   under the same brush as an extremist in that way for who I

21   followed.  I followed a lot of people on there, but I also

22   didn't address -- and they only took snippets of that

23   Telegram -- they didn't pull my business up whereas I was

24   trying to run a T-shirt business.  They didn't put -- that's

25   the only thing I actively posted in, and Telegram was my

1    personal page that I created where I was advertising my

2    business like any other business owner does through

3    Instagram, Facebook, and such.

4              THE COURT:  Let me ask you about that business.

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  It says that it's a T-shirt company,

7    and I'm sure it did sell T-shirts, but it's called Powder

8    Keg Patriots.

9              THE DEFENDANT:  Yes, sir.

10              THE COURT:  That would suggest, at least, that it

11   is a, you know -- that it may have some connections, at

12   least, to some of the other groups that wrapped themselves

13   in patriotism.  And the name "Powder Keg" suggests a certain

14   degree of volatility, perhaps, or --

15              THE DEFENDANT:  So address that?

16              THE COURT:  Please do.  I just saw it, and I

17   wondered what it actually was.

18              THE DEFENDANT:  Thank you for giving me the

19   opportunity to talk about that.  Actually the name "Powder

20   Keg" was meant -- "Powder Keg Patriots" was -- if you read

21   the description on my website where it said it was a

22   historical reference to the Boston Massacre where there was

23   a shot heard around the world.  And like I said in my

24   description, I wanted the message to be spread in the same

25   fact, the message.  Everything I wrote were just quotes from

1    founding fathers.  Everything that I put on there was never

2    anything different than anything put in quotes.

3            To be honest, like that's where my passion lies,

4    is in history.  I love history.  All I was trying to do was

5    to bring history in the front of people as a reminder of

6    what has been said about the freedoms that we have so we're

7    not voluntarily just giving away freedoms.

8            THE COURT:  All right.  Anything else?

9            THE DEFENDANT:  No, Your Honor.

10           MR. ORENBERG:  Your Honor, may I just add one

11   additional thing?

12           THE COURT:  Sure.

13           MR. ORENBERG:  As the Court is aware, Mr. Galloway

14   has been in this vocational training school for some period

15   of time now.  It's my understanding from conversations with

16   him that if his ability to attend school, to continue to

17   attend school, is interrupted for even a short period of

18   time.  It's going to cause him to lose everything,

19   everything he's achieved so far with his schooling.  He

20   would have to go back and start all over again.

21           So I wanted to --

22           THE COURT:  When does his program end, or when

23   does he have a vacation?

24           THE DEFENDANT:  My program ends March 28th, Your

25   Honor, and I'm nine months in so far.  I have 100 percent

1    attendance, 4.0 GPA, and I'm a part of the honor roll

2    society in school as well.

3         Last thing I do want to add, Your Honor, is before

4    even at -- I had not participated in actively or inactively

5    any association with any political thing at all, and I have

6    steered clear 100 percent.  That's not something that this

7    Court ever has to worry about from me again, Your Honor.

8         THE COURT:  All right.  Obviously the Court has

9    handled lots of January 6th cases, as Mr. Orenberg and the

10   government knows.  You know, I try to -- or I do sentence

11   each defendant based on the unique facts that relate to him

12   or her, and I have not hesitated to give low-level

13   misdemeanant defendants either straight probation or a short

14   period of home confinement and community service.

15        You certainly fall towards the low end of

16   culpability and involvement.  You were not one of the first

17   ones in, although ten minutes after the initial breach is

18   still within the first, you know, at least wave of folks.

19   You only stayed for ten minutes.  You didn't go to the floor

20   or any private offices.  You did not assault anybody or

21   break anything.  Obviously you were not a leader or an

22   organizer.  I don't believe that you are a Proud Boy or

23   affiliated with the Proud Boys just based on the -- you

24   know, the social media posts that I've seen.

25        But there are other factors that distinguish you

1    from the lowest level offenders, including some of the

2    others that I have sentenced.

3         As the government noted, you went in through a

4    broken window not too long after the first breach, so

5    obviously you knew you were not supposed to be there, and

6    you knew that it was a dangerous situation, and, as a

7    veteran especially, I think you should have recognized the

8    volatility of what position you were in.

9         Second, you bragged about your involvement after

10   you had had a chance to reflect on what had gone on earlier

11   that day.  And on that, I watched the video, and, you know,

12   I don't mean to single you out, but this is a refrain that I

13   have heard from a number of January 6th defendants who I've

14   had, and this notion that, you know, F the government, I own

15   these streets because I pay taxes, right?  And that was a

16   theme or at least a point that you made in that speech.

17        And it occurred to me -- and, again, this applies

18   to a number of other folks as well -- you know, based on the

19   presentence report, your sole source of income right now is

20   a disability pension, and who pays for that?  The federal

21   government pays for that.

22        You are a veteran.  Your service should be

23   honored.  You should be very proud of your service.  But

24   yet, still, your income is being paid by the federal

25   government.

1          You submitted a number of VA hospital records that

2     is for healthcare that I'm sure that you did not pay for

3     yourself.  That's a benefit being paid by the federal

4     government.

5          You and your wife owned a T-shirt shop, and I

6     don't -- that's a great entrepreneurial endeavor, but based

7     on the presentence report, it was not generating enough in

8     profits for you to have to pay any taxes on that income.

9     And even before January 6th you were making $50,000, $60,000

10    as a sales rep, and if you're married and have a few

11    dependents, you know, I don't think you were paying that

12    much in taxes either.

13         So you have a right to protest.  You don't have to

14    pay taxes in order to protest the government and to speak

15    your mind, okay?  And I'm not suggesting that.  But to sit

16    there and to say, you know, I own these streets because I

17    pay taxes and screw the government and all that, you know, I

18    just don't think is honest, all right?  And, again, I'm not

19    singling you out, but that's something that, you know,

20    occurred to me that you should think about.

21         In any event, going back to the distinguishing

22    factors, you did lie to the FBI.  You said you didn't go in.

23    You said it was Antifa.  You know, that's a serious thing.

24    I just had a week-long trial back in the spring of a

25    Washington, D.C., lawyer who was criminally charged with one

1    count, and that was lying to the FBI.  Now, different

2    circumstances, but, you know, again, as a military veteran,

3    I would expect you to have a little more respect for law

4    enforcement and for the rule of law than to try to deceive

5    FBI agents when they come to your house.

6         So with all of that -- you know, look, to your

7    credit, you seem to be a hard-working guy.  From what you've

8    told me today, I think you're a smart guy.  I empathize with

9    you in terms of your -- you know, the PTSD and other things

10   that you may be suffering from.  To your credit, you seem to

11   have acknowledged a need to address that, and you're doing

12   so, and I would encourage you to continue that.

13        So taking all the factors into account, I agree

14   with the government that a short term of imprisonment is

15   called for.  I also agree with probation that -- you know, I

16   don't think that we need to saddle the probation officer

17   with having to supervise you with another year or two.

18   You've shown, since your arrest, that you can be compliant,

19   and I fully expect that you will remain out of trouble.

20   You're smart enough to know that that would not be a wise

21   decision, to do something, anything, like this again, and

22   based on what you've told me, I'm satisfied that there's a

23   low risk of that.

24        So with that, pursuant to the Sentencing Reform

25   Act of 1984 and in consideration of the provisions of 18 USC

1    3553, it is the judgment of Court that you are hereby

2    committed to the custody of the Bureau of Prisons for a term

3    of 30 days as to Count 4.

4          In addition, you are ordered to pay a special

5    assessment of $10 in accordance with 18 USC 3013.  You are

6    also ordered to make restitution to the Architect of the

7    Capitol in the amount of $500.  The Court determines that

8    you do not have the ability to pay interest and therefore

9    waives any interest or penalties that may accrue on the

10   balance.  Restitution payments shall be made to the Clerk of

11   the Court for further disbursement to the Architect of the

12   Capitol.

13         I will also accept the probation officer's

14   recommendation that you pay a fine in the amount of $1,000.

15   The Court determines that you do not have the ability to pay

16   interest and therefore waives any interest or penalties that

17   may accrue on that balance.

18         The Court will not impose a term of probation

19   following your incarceration.  The Court will defer your

20   reporting for incarceration until after your program

21   concludes on March 28, 2023.

22         The financial obligations are immediately payable

23   to the Clerk of the Court.  Within 30 days of any change of

24   address you shall notify the Clerk of the Court of the

25   change until such time as the financial obligation is paid

1    in full.

2            Ms. Field, since there is no probation, there's no

3    payment schedule, I don't believe, in your recommendation.

4    What do you recommend in terms of payment schedules for the

5    restitution and the fine?

6            THE PROBATION OFFICER:  Your Honor, we would

7    recommend a lower-end payment per month.  Normally our

8    office starts at around $50 to $100 per month.  In looking

9    at his financial profile, I feel somewhere in between -- in

10   there would be appropriate in his case.

11           THE COURT:  Mr. Galloway, it would -- obviously,

12   if you want to get all of this behind you as soon as

13   possible, it would be better for you to pay the fine and the

14   restitution now or soon, but I will order the payments in

15   the amount of $100 per month for a period -- I guess that's

16   15 months, Ms. Field?

17           THE PROBATION OFFICER:  Yes, Your Honor.

18           THE COURT:  -- beginning in October, or beginning

19   this month.  And this will be spelled out in the judgment

20   and committal order.

21           The probation office shall release the presentence

22   report to all appropriate agencies, including the United

23   States Probation Office in the approved district of

24   residence.  Although that doesn't apply since there will be

25   no probation.

1          You have the right to appeal the sentence imposed

2     by the Court if the period of imprisonment is longer than

3     the statutory maximum.  If you choose to appeal, you must

4     file any appeal within 14 days after the Court enters

5     judgment.

6          You also have the right to challenge the

7     conviction entered or the sentence imposed if new and

8     currently unavailable information becomes available to you

9     or on a claim that you received ineffective assistance of

10    counsel in entering your plea of guilty.

11          If you are unable to afford the cost of an appeal,

12    you may request permission from the Court to file an appeal

13    without cost to you.

14          Any other objections, Counsel?

15          MR. MANNING:  No objection, Your Honor.  The

16    government would just move to dismiss Counts 1 through 3 of

17    the information.

18          THE COURT:  So ordered.

19          Mr. Orenberg, placement recommendation?  I don't

20    know where you -- he lives in Nashville.  I don't know if

21    they'll place him at a federal facility or not or whether

22    they have an agreement with a local facility in Nashville,

23    but a recommendation in close proximity to Nashville?

24          MR. ORENBERG:  Yes, Your Honor.

25          THE DEFENDANT:  Can I talk to you in a breakout

1    room about that real quick, Mr. Orenberg?

2              THE COURT:  We can put you folks in a breakout

3    room after we conclude.

4              MR. ORENBERG:  And, Judge, I can send a letter to

5    the Court regarding placement.

6              Is that what you want to talk about, Mr. Galloway?

7    The placement?

8              THE DEFENDANT:  Yes, sir.

9              MR. ORENBERG:  Okay.

10             THE COURT:  Well, make it sooner rather than later

11   because we have to issue the J&C soon after the oral

12   pronouncement.

13             Mr. Galloway, nothing personal, but I hope not to

14   see you again.  Good luck to you.  I always tell folks that

15   they shouldn't be judged by the worst mistake that they

16   made.  That certainly applies to you.

17             You know, express your views.  Be involved in

18   politics.  You have that right.  You will always have that

19   right.  We always encourage civic participation.  But leave

20   all this nonsense behind and do it in a legitimate way,

21   okay?

22             THE DEFENDANT:  Yes, sir.  Thank you, sir.

23             THE COURT:  All right.  Good luck to you.

24             THE DEFENDANT:  Thank you.

25        (Whereupon the hearing was concluded at 11:49 a.m.)

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3          I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8       **NOTE:**  This hearing was held remotely by Zoom or some

9    other virtual platform and is subject to the technological

10   limitations of court reporting remotely.

11          Dated this 1st day of November, 2022.

12

13

                        <u>/s/Lisa A. Moreira, RDR, CRR</u>
14                      Official Court Reporter
                        United States Courthouse
15                      Room 6718
                        333 Constitution Avenue, NW
16                      Washington, DC 20001

17

18

19

20

21

22

23

24

25